SHIRLEY A. CASELLA, Plaintiff v. RICHARD J. ALDEN, EXECUTOR OF THE ESTATE OF ROSS R. CASELLA, DECEASED, Defendant

No. COA08-1316

(Filed 15 September 2009)

**1. Divorce— equitable distribution—reconciliation prior to death extinguished claim**

The trial court did not err by dismissing defendant executor's equitable distribution claim where the trial court properly concluded based on the undisputed objective evidence that the Casellas had resumed marital relations prior to the husband's death. An equitable distribution claim is extinguished by operation of N.C.G.S. § 50-20(l)(1) in these circumstances.

**2. Appeal and Error— preservation of issues—mootness**

Defendant's arguments in an equitable distribution case directed at an alternative conclusion based on a second method of proof were not addressed because the Court of Appeals upheld the trial court's conclusion as to the first method of proof.

Appeal by defendant from judgment entered 8 April 2008 by Judge Alonzo Brown Coleman, Jr. in Chatham County District Court. Heard in the Court of Appeals 24 March 2009.

*Wyrick Robbins Yates & Ponton, LLP, by K. Edward Greene and Tobias S. Hampson; and Alexander & Miller, LLP, by Sydenham B. Alexander, Jr. and Meg K. Howes, for plaintiff-appellee.*

*The Brough Law Firm, by G. Nicholas Herman, for defendant-appellant.*

CASELLA v. ALDEN

[200 N.C. App. 24 (2009)]

GEER, Judge.

Decedent Ross R. Casella and plaintiff Shirley A. Casella were separated when Mr. Casella was diagnosed with untreatable cancer. Subsequently, both Mr. Casella and Ms. Casella sought equitable distribution of their property and a divorce. Prior to any hearing on those issues or any agreement by the spouses, Ms. Casella joined Mr. Casella in his home, where approximately three weeks later Mr. Casella passed away. Defendant Richard J. Alden, the executor of Mr. Casella's estate, appeals from the trial court's judgment that dismissed defendant's equitable distribution claim against Ms. Casella on the grounds that the spouses had reconciled prior to Mr. Casella's death. Because we agree with the trial court that the record contains undisputed objective evidence of reconciliation, we affirm.

Facts

The trial court found the following facts, almost all of which are unchallenged on appeal. The Casellas married on 1 May 1954 and separated on 28 November 2004. They had two children, Rosalyn and John. Prior to their separation, the Casellas were living in Chapel Hill, North Carolina, in a home that they held as tenants by the entirety. After their separation, Mr. Casella moved to New Philadelphia, Ohio, where he resided until his death. Ms. Casella continued to live in their Chapel Hill home after the separation. Mr. Casella visited Ms. Casella in North Carolina approximately eight times in 2005. They would spend time together, including going out to dinner, but Mr. Casella would spend the night in a hotel. Although the timing is unclear, at some point during the separation, Mr. Casella developed a relationship with Carole Eberle, whom he visited in Florida.

In the spring and summer of 2005, Mr. Casella and Ms. Casella divided their joint investment accounts, with each receiving approximately half of the investments. They also equally divided their IRA accounts. The two, however, maintained a joint checking account that they supplemented from their separate accounts for maintaining property they owned together in Pennsylvania, North Carolina, and Florida, as well as paying the premiums for a supplemental health care insurance policy for both Mr. Casella and Ms. Casella.

At the time of their separation, the spouses each retained an attorney to draft separation and property settlement agreements. Although proposed agreements were exchanged, Mr. Casella and Ms. Casella ultimately never entered into an agreement. On 20 January 2006, Ms. Casella filed a complaint for divorce and equitable distribu-

CASELLA v. ALDEN

[200 N.C. App. 24 (2009)]

tion. Mr. Casella filed an answer on 2 March 2006, joining in the request for a divorce and seeking distribution of the marital and divisible property not already divided by agreement.

Mr. Casella was ultimately diagnosed with untreatable cancer and was admitted to the Cleveland Clinic in Ohio in March 2006. He stayed there for several weeks. While in the hospital, Mr. Casella granted a general power of attorney to defendant Richard Alden, his nephew. Ms. Casella traveled to the clinic, stayed in a nearby hotel, and visited Mr. Casella on a daily basis. Ms. Eberle also traveled to Ohio to visit Mr. Casella in the hospital.

Mr. Casella was discharged from the clinic in mid-March and returned to his home in New Philadelphia. Shortly before the discharge, Ms. Casella returned to Chapel Hill. Ms. Eberle initially accompanied Mr. Casella to his home in New Philadelphia, but returned to Florida in late March. On 30 March 2006, Charles D. Harris, a vice president with PNC Bank, visited Mr. Casella at his home to review Mr. Casella's investment accounts and the status of his will. Mr. Harris asked Mr. Casella whether he wanted to change the beneficiary designation on his IRA account, which still listed Ms. Casella as the primary beneficiary. Mr. Casella never changed the beneficiary designation.

After learning that Ms. Eberle had left New Philadelphia, Ms. Casella drove from North Carolina to Ohio to be with Mr. Casella. While Ms. Casella was on her way to Ohio, Mr. Alden telephoned Mr. Casella's attorney in North Carolina, Reid Phillips. Mr. Phillips advised Mr. Alden that reconciliation would have legal implications in the divorce proceedings and that steps should be taken to avoid reconciliation if Mr. Casella did not intend to reconcile.

Ms. Casella arrived at Mr. Casella's home in New Philadelphia on 4 April 2006 and was greeted warmly by everyone there, including Mr. Casella. Ms. Casella spent her first night there sleeping on an inflatable bed adjoined to Mr. Casella's hospital bed. They held hands as they fell asleep.

On either 5 or 6 April 2006, Mr. Alden relayed Mr. Phillips' advice to Mr. Casella. He also went to Mr. Casella's home, inquired whether Ms. Casella was there to reconcile with Mr. Casella, and asked Ms. Casella if she would be willing to sign a written statement that she had no intent to reconcile with Mr. Casella. Ms. Casella called her attorney in North Carolina, who advised her not to sign anything, and, as a result, Ms. Casella did not sign any such statement.

Later that afternoon, Mr. Casella and Ms. Casella had a private conversation in his bedroom.[1] Following that conversation, Ms. Casella told Mr. Casella that she was willing to get back together with him as his wife. From then on, Mr. Casella and Ms. Casella slept together in the same bed every night until his death on 24 April 2006. Prior to going to sleep each night, they held hands and held each other. Other people living in the home, as well as some visitors, knew that Mr. Casella and Ms. Casella were sleeping in the same bed.

During that time, Ms. Casella, as well as others, provided care to Mr. Casella. She fed and bathed him, helped him move from place to place, tried to make him more comfortable, provided him with medicine and water, helped him to the bathroom, helped the hospice worker change the sheets when he had bowel movements in the bed, and gave him other general care. People staying in the home with Mr. and Ms. Casella and visitors to the home observed Ms. Casella caring for Mr. Casella. Visitors also observed Ms. Casella holding Mr. Casella's hand and saw her almost always at his bedside. The trial court found that "[t]he Plaintiff was observed by visitors as being there as Ross Casella's wife."

Although Mr. Casella was physically very ill, he remained mentally competent until his death. He executed his will on 13 April 2006, naming Mr. Alden as his executor. Ms. Casella was not left any property under the provisions of the will. Mr. Casella died on 24 April 2006.

Ms. Casella visited the funeral home with her son and discussed with the funeral director the casket and flower selections. She also chose the suit and tie in which Mr. Casella was dressed. Ms. Casella greeted guests at the wake and sat with other family in the front row of the church at the funeral service and at the grave-site ceremony. She helped organize a memorial service for Mr. Casella in Pennsylvania at which she again sat in the front row of the church and greeted visitors at a meal after the service.

After Mr. Casella's death, Mr. Alden was substituted as the named defendant in this action. Ms. Casella amended her complaint to omit her claim for equitable distribution, but Mr. Alden asserted a counterclaim for equitable distribution. Ms. Casella filed a reply alleging that Mr. Casella and she "were not living separate and apart at the time of Ross Casella's death, as required by G.S. 50-20(l)(1)[.]"

---

1. The trial court excluded any testimony by Ms. Casella regarding what Mr. Casella said to her.

CASELLA v. ALDEN

[200 N.C. App. 24 (2009)]

The trial court held a hearing solely on the issue of reconciliation and, in a judgment entered 8 April 2008, concluded that "[b]ased on the substantial objective evidence existing as of the time of Ross Casella's death, Ross Casella and Plaintiff had as a matter of law resumed their marital relationship and were not therefore living separate and apart at the time of the death." The court alternatively concluded that "[a]lthough this Court does not believe the objective evidence of reconciliation is in dispute, even assuming so, the parties had the mutual intent (existing at the time of Ross Casella's death) to reconcile or resume their marital relationship." Based on its determination that Mr. Casella and Ms. Casella had reconciled, the trial court dismissed defendant's equitable distribution claim with prejudice. Mr. Alden timely appealed to this Court.

## Discussion

[1] Mr. Alden argues on appeal that there is insufficient evidence to support the trial court's findings of fact and conclusions of law that Ross Casella and Shirley Casella had reconciled at the time of Mr. Casella's death. When, as here, the trial court sits without a jury, the standard of review on appeal is whether there was competent evidence to support the trial court's findings of fact and whether those findings of fact supported its conclusions of law. *Oakley v. Oakley,* 165 N.C. App. 859, 861, 599 S.E.2d 925, 927 (2004). The trial court's findings are conclusive on appeal if there is evidence to support them, despite the existence of evidence in the record that might support a contrary finding. *Hand v. Hand,* 46 N.C. App. 82, 87, 264 S.E.2d 597, 599-600, *disc. review denied,* 300 N.C. 556, 270 S.E.2d 107 (1980). The trial court's conclusions of law, however, are reviewed de novo. *Shear v. Stevens Bldg. Co.,* 107 N.C. App. 154, 160, 418 S.E.2d 841, 845 (1992).

N.C. Gen. Stat. § 50-20(l)(1) (2007) provides: "A claim for equitable distribution, whether an action is filed or not, survives the death of a spouse so long as the parties are living separate and apart at the time of death." Thus, an equitable distribution claim is extinguished by operation of N.C. Gen. Stat. § 50-20(l)(1) if, at the time of one of the spouses' death, the husband and wife had resumed marital relations. N.C. Gen. Stat. § 52-10.2 (2007) sets out the standard for determining whether separated spouses have reconciled: " 'Resumption of marital relations' shall be defined as voluntary renewal of the husband and wife relationship, as shown by the totality of the circumstances. Isolated incidents of sexual intercourse between the parties shall not constitute resumption of marital relations."

This Court has recognized that " '[t]here may be a reconciliation and resumption of cohabitation with an intention that it shall be a normal and permanent relationship, even though, despite the intention, the relationship lasts only a short time.' " *Newton v. Williams*, 25 N.C. App. 527, 531, 214 S.E.2d 285, 287 (1975) (quoting 1 *Lee's North Carolina Family Law* § 35 (3d ed. 1963)). "The method by which a trial court may evaluate whether separated spouses have reconciled is dictated by 'two lines of cases regarding the resumption of marital relations: those which present the question of whether the parties hold themselves out as [husband] and wife as a matter of law, and those involving conflicting evidence such that mutual intent becomes an essential element.' " *Fletcher v. Fletcher*, 123 N.C. App. 744, 748, 474 S.E.2d 802, 805 (1996) (quoting *Schultz v. Schultz*, 107 N.C. App. 366, 369, 420 S.E.2d 186, 188 (1992), *disc. review denied*, 333 N.C. 347, 426 S.E.2d 710 (1993)), *disc. review denied*, 345 N.C. 640, 483 S.E.2d 706 (1997).

The first method requires the existence of undisputed and "substantial objective indicia of cohabitation as [husband] and wife." *Schultz*, 107 N.C. App. at 369, 420 S.E.2d at 188. In cases in which such evidence is produced, the trial court may find that the spouses reconciled as a matter of law. *Id. See also Oakley*, 165 N.C. App. at 863, 599 S.E.2d at 928 ("[W]here there is objective evidence, that is not conflicting, that the parties have held themselves out as [husband] and wife, the court does not consider the subjective intent of the parties."). On the other hand, the second method is used when "the facts are in dispute, and the trial court must consider the subjective intent of the parties." *Schultz*, 107 N.C. App. at 371, 420 S.E.2d at 189.

Defendant first argues that "because all of the objective evidence on the issue of reconciliation was undisputed and nonconflicting, the trial court erred in considering the subjective evidence on the question as part of the basis for the court's Judgment." Defendant's argument is based on the trial court's conclusion of law in which it states: "Although this Court does not believe the objective evidence of reconciliation is in dispute, even assuming so, the parties had the mutual intent (existing at the time of Ross Casella's death) to reconcile or resume their marital relationship."

The trial court was, however, providing alternative bases for its decision in the event of an appeal. As the language of the order indicates, the trial court simply ruled that if it had erred in relying upon the first method for determining whether a reconciliation had oc-

curred, then it was alternatively concluding based on the second method that resumption of the marital relationship had occurred. *See id.* at 369, 420 S.E.2d at 188 ("[T]hese two lines of cases establish two alternative methods by which a trial court may find that separated spouses have reconciled."). This approach promotes judicial economy since it means that if this Court disagrees with the trial court that the evidence is undisputed, we are not required to remand for the trial court to apply the second method.

Once the trial court chose to employ the second method as an alternative basis for its ruling, it was required to make the necessary findings of fact to resolve the factual issues and to consider the subjective intent of the parties. Thus, the order contains findings of fact relating to both objective evidence (supporting the conclusion of law relating to the first method) and subjective intent (supporting the conclusion of law relating to the second method). Consequently, contrary to Mr. Alden's position on appeal, the trial court did not err in including in its order findings of fact regarding subjective intent.

We first address the trial court's conclusion pursuant to the first method that "[b]ased on the substantial objective evidence existing as of the time of Ross Casella's death, Ross Casella and Plaintiff had as a matter of law resumed their marital relationship and were not therefore living separate and apart at the time of the death." We hold that the trial court properly determined that the facts were not in dispute and that the objective evidence established that the Casellas had reconciled as a matter of law.

*In re Estate of Adamee,* 291 N.C. 386, 393, 230 S.E.2d 541, 546 (1976), is a leading decision on this issue. In *Adamee,* our Supreme Court began by noting the "public policy" that prohibits spouses from maintaining that they are separated when they "continue to live together in the same home—holding themselves out to the public as husband and wife . . . ." *Id.* at 391, 230 S.E.2d at 545. The Court explained that " '[s]eparation means cessation of cohabitation, and cohabitation means living together as [husband] and wife, though not necessarily implying sexual relations. Cohabitation includes other marital responsibilities and duties.' " *Id.* at 392, 230 S.E.2d at 546 (quoting *Young v. Young,* 225 N.C. 340, 344, 34 S.E.2d 154, 157 (1945)). The spouses must live apart in " 'such manner that those in the neighborhood may see that the husband and wife are not living together.' " *Id.* (quoting *Dudley v. Dudley,* 225 N.C. 83, 86, 33 S.E.2d 489, 491 (1945)). The Court observed:

"Marriage is not a private affair, involving the contracting parties alone. Society has an interest in the marital status of its members, and when a husband and wife live in the same house and hold themselves out to the world as [husband] and wife, a divorce will not be granted on the ground of separation, when the only evidence of such separation must, in the language of the Supreme Court of Louisiana (in the case of *Hava v. Chavigny*, 147 La. 331, 84 So. 892) 'be sought behind the closed doors of the matrimonial domicile.' Our statute contemplates the living separately and apart from each other, the complete cessation of cohabitation."

*Id.* (quoting *Dudley*, 225 N.C. at 86, 33 S.E.2d at 491).

The Court then held that "when separated spouses who have executed a separation agreement resume living together in the home which they occupied before the separation, they hold themselves out as [husband] and wife in the ordinary acceptation of the descriptive phrase. Irrespective of whether they have resumed sexual relations, in contemplation of law, their action amounts to a resumption of marital cohabitation which rescinded their separation agreement insofar as it had not been executed." *Id.* at 392-93, 230 S.E.2d at 546 (internal quotation marks omitted). *See also Schultz*, 107 N.C. App. at 373, 420 S.E.2d at 190 ("When the parties objectively have held themselves out as [husband] and wife and the evidence is not conflicting, we need not consider the subjective intent of the parties.").

In *Fletcher*, 123 N.C. App. at 750, 474 S.E.2d at 806, this Court noted that the General Assembly, subsequent to *Adamee*, amended N.C. Gen. Stat. § 52-10.2 to provide that a determination whether marital relations were resumed must be based on "the totality of the circumstances." The Court, therefore, concluded that merely resuming living together in the marital home would not necessarily be sufficient since "[t]o resolve the issue [regarding resumption of marital relations], courts must evaluate all the circumstances of a particular case." 123 N.C. App. at 750, 475 S.E.2d at 806 (internal quotation marks omitted).

In addressing the merits of the appeal before it, the *Fletcher* panel concluded that factors cited in *Adamee* and *Schultz* as indicative of reconciliation were "noticeably absent in the case *sub judice*." *Id.* The Court explained:

For example, plaintiff never 'moved' back into or resumed cohabitation in the marital home, but instead maintained her separate residence at which she kept her possessions and from which she

removed only clothing for work. In addition, the time period involved herein was less than a week, compared with the four and eight month time frames involved in *Schultz* and *Adamee* respectively. Further, no evidence in the record reveals the parties resumed the sharing of chores or household responsibilities, that they accompanied each other to public places so as to '[hold] themselves out as husband and wife,' *Adamee*, 291 N.C. at 392, 230 [S.E.2d] at 546, or that they indicated to family and/or friends that their problems had been resolved or that they desired to terminate the separation.

*Id.* at 750-51, 474 S.E.2d at 806-07. The Court further observed that the evidence instead showed that the parties continued to abide by the terms of the separation agreement and that "defendant's statement that he wished plaintiff to leave because 'he wanted to be with his girlfriend' comprise[d] a compelling indication that no reconciliation with plaintiff occurred." *Id.* at 751, 474 S.E.2d at 807.

In this case, Mr. Alden, to whom Mr. Casella had granted a general power of attorney, learned from Mr. Casella's counsel that Mr. Casella should take steps to avoid reconciliation if Mr. Casella did not wish to reconcile. Although told of this advice, Mr. Casella never took any such steps. Instead, Ms. Casella, after discussing reconciliation with Mr. Casella, began sharing Mr. Casella's bed—a fact the Casellas allowed the hospice worker and other people staying at the house to know. Ms. Casella helped her children and the hospice worker care for Mr. Casella, including wiping him down at night when he had hot flashes, changing sheets soiled with bowel movements, and helping him to the bathroom.

Both of the Casellas told other people that they had reconciled or, as Mr. Casella explained to one friend, they had things "straightened out." The Casellas interacted with each other in front of other people in a manner that suggested to the visitors that they were husband and wife. Although Mr. Casella had recently visited with a girlfriend, she left for Florida prior to the alleged reconciliation, and Mr. Alden points to no evidence of any involvement with that girlfriend once the Casellas discussed reconciliation. In addition, although Mr. Casella was approached by a bank representative about changing his beneficiary from Ms. Casella on an IRA valued at $1.2 million, Mr. Casella did not do so. Following Mr. Casella's death, Ms. Casella's role in arranging for and participating in the various services was consistent with the role of a wife, including selecting the suit and tie in which Mr. Casella would be buried, sitting in the place normally occupied by

a wife, receiving the United States flag that draped the coffin, and greeting the mourners.

In short, in contrast with *Fletcher*, the record contains undisputed evidence that the Casellas were cohabiting by sleeping in the same bed, and Ms. Casella had assumed responsibilities for the type of intimate care of Mr. Casella that a wife or child would perform. Although the period of time involved was shorter than that in *Adamee* and *Schultz*, both of the Casellas indicated to friends that they had reconciled. They held themselves out to the public in a manner suggestive of husband and wife, and people interacted with Ms. Casella as if she were Mr. Casella's wife.

Mr. Alden, in arguing that the undisputed evidence "was entirely inconsistent with abrogating their separation and resuming the marital relationship," focuses primarily on the time frame prior to Ms. Casella's drive to Ohio. He points to evidence of the parties' separation and division of property, Mr. Casella's relationship with Ms. Eberle, the efforts to draft a separation and property settlement, and Ms. Casella's taking only two bags of clothes and a makeup case when traveling to Ohio. The trial court, however, found that a change subsequently occurred in the Casellas' relationship:

19. On the afternoon of either the 5th or 6th of April 2006, the Plaintiff and Ross Casella had a private conversation about getting back together. In response to that conversation, the Plaintiff told him she was willing to get back together with him as his wife. Thereafter, and before Ross Casella's death the Plaintiff told others she and Ross Casella had gotten back together as man and wife.

Although defendant assigns error to this finding, it is supported by competent, undisputed evidence.

The relevant time frame is not, therefore, the period during which the parties were unquestionably separated, but rather the time frame after which Ms. Casella contends that they reconciled. For there to be a resumption of marital relations, there necessarily must have been a separation. Thus, in all cases involving this issue, there will be undisputed evidence of separation. The question becomes whether at some time the parties ceased to be separated and resumed their marital relations. The undisputed objective evidence pertinent to that inquiry is the evidence that exists following the date of alleged reconciliation.

With respect to the time frame relevant in this case—5 or 6 April 2006 through 24 April 2006—Mr. Alden argues that Ms. Casella was not the only one caring for Mr. Casella, but rather she shared that responsibility with their son, John, and the hospice worker. Mr. Alden similarly points to the other family members' involvement, with Ms. Casella, in the funeral and memorial services. Mr. Alden stresses that Ms. Casella simply behaved like their son, John, did. This argument, however, supports the trial court's decision. Ms. Casella was functioning as a family member—as close as a son—and not as someone separated from Mr. Casella and just visiting like other friends. Indeed, Ms. Casella shared the intimate care of Mr. Casella with only their son and a professional health care provider. While other people visiting may also have shown physical affection, visitors perceived the Casellas' interactions as being like husband and wife.

Mr. Alden argues that the testimony of visitors regarding the Casellas' statements about reconciliation and the visitors' "wholly subjective impressions" of the Casellas' interactions should be disregarded as evidence relating only to subjective intent. Mr. Alden cites no authority supporting his contention. To the contrary, *Fletcher* specifically noted, in holding under the first method of proof that no reconciliation occurred, that there was no evidence "that they indicated to family and/or friends that their problems had been resolved or that they desired to terminate the separation." *Fletcher*, 123 N.C. App. at 751, 474 S.E.2d at 807. Further, as discussed above, *Adamee*, *Schultz*, and *Fletcher* all discuss whether the spouses behaved in public in a manner so as to hold themselves out as husband and wife. *See also In re Estate of Archibald Edwards*, 183 N.C. App. 274, 278, 644 S.E.2d 264, 267 (2007) (upholding determination that decedent and appellee reconciled and resumed marital relations based on appellee's affidavit that stated, in part, that the spouses " 'held [themselves] out to [their] families and to the public as being husband and wife' ").

In addition, Mr. Alden relies heavily on the undisputed evidence that Mr. Casella signed his will on 13 April 2006, but did not leave anything to Ms. Casella in the will. Ms. Casella, however, points to the undisputed evidence that the spouses had already divided much of their marital property during their separation, including half of a multi-million dollar IRA. In addition, Mr. Casella had chosen to leave Ms. Casella as the beneficiary for his half of the IRA. *See id.* at 279, 644 S.E.2d at 267 (citing as evidence of reconciliation the fact that decedent, after alleged reconciliation, had named husband as pri-

IN RE M.D., N.D.

[200 N.C. App. 35 (2009)]

mary beneficiary of life insurance policy). Finally, much of the real estate involved was owned by the Casellas as tenants by the entirety. As Ms. Casella points out, Mr. Casella's will only devised property that had not already been given to Ms. Casella or had not passed to Ms. Casella outside the estate. In sum, a very substantial amount of property passed to Ms. Casella regardless of the will.

As N.C. Gen. Stat. § 52-10.2 states and *Fletcher* emphasizes, reconciliation is to be determined "by the totality of the circumstances." Given all of the other circumstances—including the cohabitation, Ms. Casella's provision of marital care, the statements to friends, the public behavior of the spouses, the substantial amount of property passing to Ms. Casella at Mr. Casella's death outside of the will, and Mr. Alden's failure to point to evidence of any conduct in April, apart from the will, inconsistent with reconciliation—we hold that the trial court properly concluded based on the undisputed objective evidence that the Casellas reconciled.

[2] Mr. Alden's remaining arguments address the trial court's alternative conclusion finding reconciliation based on the second method of proof. Because we have upheld the court's conclusion as to the first method, we need not address Mr. Alden's arguments directed at the second method or Ms. Casella's cross-assignment of error. We, therefore, affirm the order of the trial court.

Affirmed.

Judges McGEE and BEASLEY concur.